IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| THE CITY OF HIGH POINT, NORTH CAROLINA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:19CV540 |
| SUEZ TREATMENT SOLUTIONS INC., FIDELITY AND DEPOSIT COMPANY OF MARYLAND, and CPPE CARBON PROCESS & PLANT ENGINEERING S.A., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Plaintiff the City of High Point, North Carolina, (the "City") brings causes of action for breach of contract, breach of warranty, negligence, negligent misrepresentation, fraud, unfair and deceptive trade practices, and products liability against Defendants Suez Treatment Solutions Inc. ("Suez"), Fidelity and Deposit Company of Maryland ("Fidelity"), and CPPE Carbon Process & Plant Engineering S.A. ("CPPE Carbon"). (Doc.

1.) [1] This matter is before the court on Defendant Suez's motion to dismiss, (Doc. 8), which the court will grant in part and deny in part as set forth herein.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On a motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint . . . ." Ray v. Roane, 948 F.3d 222, 226 (4th Cir. 2020) (citing King v. Rubenstein, 825 F.3d 206, 212 (4th Cir. 2016)). The facts, taken in the light most favorable to Plaintiff, are as follows.

### A.    Factual Background

#### 1.    Parties

Plaintiff the City is a municipality located in North Carolina. (Complaint ("Compl.") (Doc. 1) ¶ 1.)

Defendant Suez is a corporation organized under the laws of New York with its principal place of business in Virginia. (Id. ¶ 2.) Suez "provides environmental equipment, and design and installation services to companies and municipalities." (Id.)

---

[1] In its Answer, (Doc. 31), Defendant Fidelity asserts seven affirmative defenses, including that "[t]he Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a cause of action upon which relief can be granted." (Id. at 24.) As of March 2020, however, Fidelity has not filed a motion to dismiss Plaintiff's claims; thus, the court finds Fidelity has waived its right to file a motion to dismiss. See Local Rule 7.3(k). The court will address Defendant CPPE Carbon's motion to dismiss, (Doc. 45), in a later Memorandum Opinion.

Defendant CPPE Carbon is a Société Anonyme organized under the laws of Luxembourg, with its principal place of business there as well. (Id. ¶ 4.) CPPE Carbon "supplies air-pollution control equipment, along with design and installation services related to that equipment." (Id.)

## 2. The High Point Wastewater Treatment Plant

Plaintiff operates two wastewater treatment plants. One of these plants, known as the "Eastside Wastewater Treatment Plant" (the "Treatment Plant"), is located in Jamestown, North Carolina. (Id. ¶ 10.)

The Treatment Plant treats wastewater using a multistep process. (Id. ¶ 11.) "As part of the treatment process, solid waste is removed from the wastewater and then converted into 'sludge,'" which the City disposes of by "burning it in the Treatment Plant's sewage-sludge incinerator ("the Incinerator")." (Id. ¶ 12.)

Federal standards govern the emissions from sewage-sludge incinerators. (Id. ¶ 14.) A set of standards, "known as the 'Maximum Achievable Control Technology standards' ("the MACT standards") were first proposed for [sewage-sludge incinerators] around October 2010," and took effect in April 2016. (Id.) The MACT standards set limits on mercury emissions. (Id.)

### 3. The City's Project with Defendants

In August 2011, Plaintiff entered into an agreement with Hazen and Sawyer, P.C. ("Hazen") "to provide engineering services for an upgrade of the facilities at the Treatment Plant ("the Project").[2] The Project focused on updating and repairing the Treatment Plant's machinery. (Id. ¶¶ 15-16.)

The agreement with Hazen required Hazen to investigate Plaintiff's potential compliance with the proposed MACT standards. (Id. ¶ 17.) Emissions testing was conducted for the Treatment Plant in early 2012, which "indicated that the Incinerator's emissions at that time would not comply with some of the proposed MACT standards when the standards became effective," including the standards relating to mercury emissions. (Id. ¶ 18.)

Around February 2012, Hazen, as an agent of Plaintiff, began working with Defendant Suez for the installation of a Mercury Removal System ("MRS"). (Id. ¶ 19.) "Suez represented to Hazen that CPPE needed to be the manufacturer of the portions of the MRS that CPPE was able to supply and design," and "that the inclusion of CPPE's products and its unique 'Kombisorbon' mercury removal process in the MRS would best enable the City to

_____

[2] Defendant Suez has filed a third-party complaint against Hazen. (Doc. 10 at 33-46.)

comply with the MACT standards for the control of mercury emissions." (Id. ¶ 20.)

### 4. The Granulated Activated Carbon Adsorber

In particular, Suez "represented to Hazen that a granulated activated carbon adsorber ("GAC unit") designed and manufactured by CPPE needed to be part of the MRS." (Id. ¶ 21.) GAC units use a specific process, involving layers of activated carbon granules, to remove pollutants from exhaust gas. (Id.)

"Suez represented to Hazen that Suez had extensive experience in various incineration settings with CPPE's products, including GAC units incorporated" into sewage-sludge incinerators, and that "Suez and CPPE had the knowledge and experience necessary to provide an MRS to the City that would allow the emissions from the Incinerator to meet the MACT standards." (Id. ¶¶ 22-23.) Suez allegedly made these representations to Hazen as a "sales force, representative and/or distributor in the United States for CPPE." (Id. ¶ 24.) Suez and CPPE Carbon, however, allegedly failed to inform Hazen that GAC units had rarely been used to treat mercury emissions in sewage-sludge incinerators. (Id. ¶ 25.) Further, "[b]y 2012, GAC units in various settings had a history of catching fire or otherwise suffering high-temperature incidents, particularly during start-up and shut-down operations," which was "well known

–5–

to manufacturers and distributors in the industry, including CPPE and Suez." (Id. ¶¶ 26, 28.) Suez allegedly failed to inform Hazen of this history of incidents and, indeed, "represented to Hazen that an MRS incorporating CPPE's products and design would not experience high-temperature incidents or 'hot spots.'" (Id. ¶ 29.)

Further, CPPE Carbon's GAC unit had a nonstandard design which increased the likelihood of a fire or high-temperature incident in the GAC unit and which "did not include means for early detection or suppression of internal fires." (Id. ¶¶ 30-31.) Suez allegedly represented to Hazen that such precautions were unnecessary for CPPE Carbon's GAC unit. (Id. ¶ 31.) Suez did not inform Hazen of either the nonstandard design or of the increased fire risk. (Id. ¶ 32.)

Hazen relied upon Suez's representations about CPPE Carbon's products and would not have recommended the products to Plaintiff if Hazen had been aware that GAC units had rarely been used, that they posed a fire risk, or that CPPE Carbon's GAC unit design was even more at risk for fires or high-temperature incidents compared to other units. (Id. ¶¶ 33-34.)

Hazen recommended to Plaintiff an MRS incorporating CPPE Carbon's products, and Plaintiff relied upon Hazen's recommendations. (Id. ¶¶ 35-36.)

## 5. __Plaintiff's Contract with Suez__

In 2013, Hazen oversaw the bid process to award the contract for the design, supply, and installation oversight of the MRS. Hazen "prepared these specifications based substantially on information from Suez and/or CPPE." (Id. ¶¶ 51, 53.) "Upon information and belief, the specifications were prepared in such a way that only Suez could reasonably satisfy the bid requirements." (Id. ¶ 54.) The specifications mandated that CPPE Carbon would be the sole source of much of the equipment in the MRS, including the GAC unit. (Id. ¶ 55.)

Suez submitted the only bid at first; however, due to statutes governing the award of contracts by Plaintiff, Plaintiff had to conduct a re-bidding process. (Id. ¶¶ 56–57.) As part of this process, Hazen obtained two other bids, but neither was competitive with Suez's bid. (Id. ¶¶ 58–59.) "Suez's bid represented that Suez had specific and extensive experience relating to satisfying MACT standards for mercury emissions and the MRS that it was proposing to provide to the City." (Id. ¶ 60.) "At Hazen's recommendation, the City awarded Suez a contract [(the "Contract")] in December 2013 for the MRS work on the Project." (Id. ¶ 61.)

The Contract gave Suez design and oversight responsibilities for the installation of the MRS. (Id. ¶ 49.) In particular, Suez

was also responsible for "certain construction responsibilities, including installation of new fireproof lining in the dome of the Incinerator." (Id.)

### 6.   Incidents with the MRS

A third party installed the MRS, including the CPPE Carbon GAC unit, finishing in mid-2016. (Id. ¶¶ 70-71.) The MRS and the Incinerator (together, the "System") started up in late July 2016 but was not yet operational. (Id. ¶¶ 72, 74.) At this point, Suez allegedly "had full responsibility for the oversight and operation of the System. The System had not been turned over to the City." (Id. ¶ 73.) The system was expected to be operational in September 2016. (Id. ¶ 74.) Instead, a high-temperature or fire incident occurred in August 2016. (Id. ¶¶ 75-87.)

On August 2, 2016, while the System was shut down so a heat exchanger could be repaired, carbon monoxide levels started to increase within the GAC unit. (Id. ¶¶ 76-77.) An increase in carbon monoxide indicates that a fire or high-temperature event is occurring. (Id. ¶ 78.) Neither Suez nor CPPE Carbon allegedly noticed or reported the increased levels of carbon monoxide. (Id. ¶ 79.) The following day, Suez and CPPE Carbon left the Treatment Plant without instructing Plaintiff or its staff on how to monitor the System. (Id. ¶ 80.)

On August 9, 2016, while the System was still shut down, one of Plaintiff's employees noticed that the temperature inside the GAC unit was "high." (Id. ¶ 81.) Plaintiff contacted Suez, and Suez instructed the City to open an outlet damper on the GAC unit in order to evacuate heat from the GAC unit." (Id. ¶ 82.) The next day, however, the monitors indicated that the temperature inside the GAC unit had increased even more. (Id. ¶ 83.) "At that time, CPPE instructed City personnel to turn on the System's 'startup blower' to cool the GAC unit," but this resulted in the temperature in the GAC unit increasing dramatically. (Id. ¶¶ 83–84.) CPPE Carbon then instructed Plaintiff's staff to drench the carbon inside the GAC unit with water, which Plaintiff did for approximately two weeks. (Id. ¶¶ 84-85.) "The water flowing out of the bottom of the GAC unit during the efforts to extinguish the first fire was extremely acidic, and the burning carbon created high concentrations of toxic sulfur-dioxide gas," which "created health and safety hazards at the Treatment Plant and potentially the surrounding area." (Id. ¶ 86.)

Plaintiff did not have control over the System prior to this incident. (Id. ¶ 89.) This incident resulted in extensive damage to the System, and the System was inoperable. (Id. ¶¶ 90-92.)

Within days of Plaintiff's fire, another fire or high-temperature incident occurred in a GAC unit on a different project involving Suez and CPPE Carbon in Connecticut. (Id. ¶¶ 93–94.)

Plaintiff alleges that, despite having "unfettered access to and control over the System to determine the cause of the first fire," and knowing about the Connecticut incident, "neither Suez nor CPPE offered the City a satisfactory explanation for why the first fire happened," nor did they provide Plaintiff with a permanent solution. (Id. ¶¶ 95–97.)

Suez and CPPE Carbon allegedly conducted "disorganized, poorly planned, patchwork repair efforts" on the System. (Id. ¶¶ 99–101.) Plaintiff alleges "Suez, either alone or in conjunction with CPPE, also modified the design of the MRS or changed various operating parameters and procedures for the MRS." (Id. ¶ 102.) Plaintiff also alleges that Suez failed to adequately train Plaintiff's staff concerning these changes to the MRS and that Suez failed to provide adequate training materials concerning these changes. (Id. ¶ 103.)

Hazen, Suez, CPPE Carbon, and the original installer began restarting the System in January 2017. (Id. ¶ 104.) This process allegedly went poorly. (Id. ¶ 105.)

Emissions testing was conducted on the System in February 2017. (Id. ¶ 106.) After testing was completed, Suez and CPPE Carbon left the Project without offering assistance regarding the operation of the MRS. (Id. ¶ 108.)

Plaintiff used the System to incinerate sludge, but the System operated "unpredictably," which Plaintiff attributes to "inadequate design, inadequate equipment, faulty work, and/or inadequate construction oversight provided by Suez and/or CPPE." (Id. ¶ 109.)

The GAC unit experienced a second fire or high-temperature incident in March 2017, which "extensively" damaged the GAC unit and other parts of the System. (Id. ¶¶ 110, 112.)

Following the second incident, Plaintiff chose to install an alternative system manufactured by another company, which has been operating safely and reliably since December 2018. (Id. ¶¶ 122, 127.)

At all times when the System was not operational between August 2016 and December 2018, Plaintiff had to haul its sludge to a landfill. (Id. ¶¶ 67, 92, 113.)

**B.** **Procedural History**

Plaintiff filed this action in this court on May 23, 2019. (Compl. (Doc. 1).) Defendant Suez filed its motion to dismiss Plaintiff's causes of action, (Doc. 8), and a brief in support

of that motion, (Def. Suez's Mem. of Law in Supp. of Mot. to Dismiss ("Suez's Br.") (Doc. 9)). Plaintiff responded, (Pl.'s Resp. to Mot. to Dismiss ("Pl.'s Resp.") (Doc. 24)), and Suez replied, (Doc. 26).

Plaintiff brings the following causes of action against Defendant Suez. The First Cause of Action alleges Suez breached the Contract with Plaintiff "for a working MRS and System that would operate safely and reliably, but Suez provided the City with a nonworking, unsafe, unreliable MRS and System that the City had to replace." (Id. ¶¶ 131–35.) The Second Cause of Action alleges breach of warranty. (Id. ¶¶ 136–39.) The Third Cause of Action alleges negligence. (Id. ¶¶ 140–55.) The Fourth Cause of Action alleges negligent misrepresentation. (Id. ¶¶ 156–61.) The Fifth Cause of Action alleges fraud. (Id. ¶¶ 162–71.) The Sixth Cause of Action alleges Unfair and Deceptive Trade Practices under N.C. Gen. Stat. § 75-1.1 ("UDTPA"). (Id. ¶¶ 172–78.)

## II.   STANDARD OF REVIEW

Because this is an action brought under diversity of citizenship jurisdiction, North Carolina substantive law applies. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79–80 (1938).

The standard for a motion to dismiss under Rule 12(b)(6), however, is a procedural matter controlled by federal law. See, e.g., Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007); Wilson v. Dryvit Sys., Inc., 206 F. Supp. 2d 749, 752 (E.D.N.C. 2002), aff'd, 71 F. App'x 960 (4th Cir. 2003) (per curiam). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556–57). When ruling on a motion to dismiss, this court accepts the complaint's factual allegations as true. Iqbal, 556 U.S. at 678. Further, this court liberally construes "the complaint, including all reasonable inferences therefrom, . . . in plaintiff's favor." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004) (citation omitted). This court does not, however, accept legal conclusions as true, and "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

## III. **ANALYSIS**

Defendant Suez moves to dismiss Plaintiff's negligence, negligent misrepresentation, fraud, and UDTPA causes of action on the basis of the economic loss rule. (Suez's Br. (Doc. 9) at 14.)[3] Suez has not moved to dismiss Plaintiff's causes of action for breach of contract and breach of warranty.

The court will first summarize the economic loss rule, then address Suez's arguments.

### A. **The Economic Loss Rule**

In North Carolina, the economic loss rule "generally bars recovery in tort for damages arising out of a breach of contract." Rountree v. Chowan Cty., 252 N.C. App. 155, 159, 796 S.E.2d 827, 830 (2017). "The rationale for the economic loss rule is that the sale of goods is accomplished by contract and the parties are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective." Moore v. Coachmen Indus., Inc., 129 N.C. App. 389, 401–02, 499 S.E.2d 772, 780 (1998). Thus, a "tort

---

[3] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

action must be grounded on a violation of a <u>duty</u> imposed by operation of law," not a violation of a duty arising purely from "the contractual relationship of the parties." <u>Rountree</u>, 252 N.C. App. at 160, 796 S.E.2d at 831 (internal quotation marks and citation omitted.) "Accordingly, North Carolina law requires courts to limit plaintiffs' tort claims to only those claims which are 'identifiable' and distinct from the primary breach of contract claim." <u>Legacy Data Access, Inc. v. Cadrillion, LLC</u>, 889 F.3d 158, 164 (4th Cir. 2018) (quoting <u>Broussard v. Meineke Disc. Muffler Shops, Inc.</u>, 155 F.3d 331, 347 (4th Cir. 1998)).

Further, "[u]nder North Carolina law, when a defective component of a larger system causes damage to the rest of the system, only economic loss has occurred, and the economic loss rule still applies." <u>Kelly v. Ga.-Pac. LLC</u>, 671 F. Supp. 2d 785, 793 (E.D.N.C. 2009) (collecting cases). "Thus, the economic loss rule does not restrict economic losses to the defective component, but may include damages to the whole product caused by a defective component." <u>Id.</u>

North Carolina courts also emphasize the availability of a contractual remedy in applying the economic loss rule. <u>See</u> <u>Hospira Inc. v. AlphaGary Corp.</u>, 194 N.C. App. 695, 704-05, 671 S.E.2d 7, 14 (2009), <u>disc. rev. denied</u>, 363 N.C. 581, 682 S.E.2d 210 (2009) (holding that the trial court erred in failing to

allow the plaintiff to bring a negligence claim when there was
no contract between the parties).

There are four exceptions to the economic loss rule if the
injury proximately caused by the promisor's negligence:

> (1) was an injury to the person or property of someone
> other than the promisee[;]
>
> (2) was to property of the promisee other than the
> property which was the subject of the contract, or was
> a personal injury to the promisee[;]
>
> (3) was loss of or damage to the promisee's property,
> which was the subject of the contract, the promisor
> being charged by law, as a matter of public policy,
> with the duty to use care in the safeguarding of the
> property from harm, as in the case of a common
> carrier, innkeeper or other bailee[; or]
>
> (4) was a wilful injury to or a conversion of the
> property of the promisee, which was the subject of the
> contract, by the promisor.

Ellis v. La.-Pac. Corp., 699 F.3d 778, 783-84 (4th Cir. 2012)

(quoting N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co., 294

N.C. 73, 82, 240 S.E.2d 345, 350-51 (1978)).

### B.  Defendant Suez

Defendant Suez argues that Plaintiff's negligence,
negligent misrepresentation, fraud, and UDTPA causes of action
are all barred by the economic loss rule. (Suez's Br. (Doc. 9)
at 14.)

-16-

## 1.    __Third Cause of Action: Negligence__

In its negligence action, Plaintiff alleges that Suez had four duties: "to use reasonable care in recommending, designing, providing and installing an MRS that was appropriate for and reasonably safe for its intended use"; "to use reasonable care to protect the System while the System was in Suez's control"; "to use reasonable care in responding to the first fire"; and "to use reasonable care in the planning and execution of remediation efforts after the first fire." (Compl. (Doc. 1) ¶¶ 141–44.) Plaintiff alleges that Suez breached these duties in several specific ways. (Id. ¶¶ 145–51.) For example, Plaintiff alleges Suez breached its duty by "designing and providing an MRS that was dangerous, inadequately tested, unreliable, and unfit for its intended use," by "failing to notice rising carbon monoxide levels inside the GAC unit before the first fire," and by "engaging in a disorganized, poorly planned, incomplete, patchwork repair effort after the first fire," among others. (Id. ¶¶ 147–48, 151.)

Suez argues that Plaintiff's "negligence claim flows entirely from Suez's performance of its contractual obligations to the City and is therefore barred by the economic loss rule." (Suez's Br. (Doc. 9) at 16.)

The court finds it useful to split Suez's alleged actions into pre-contracting and post-contracting time periods. The court will examine Suez's alleged post-contractual negligence first.

### a.  Alleged Negligence Post-Contract

Plaintiff's negligence cause of action against Suez for Suez's behavior after entering into the Contract is precisely what the economic loss rule was created to address. All of the duties Plaintiff alleges Suez owed after entering into the Contract are directly related to the Contract, to either Suez's duties under the Contract itself or to the MRS, which is the subject matter of the Contract.

For example, Plaintiff alleges Suez had the following duties: "a duty to use reasonable care in . . . designing, providing and installing an MRS that was appropriate for and reasonably safe for its intended use"; "a duty to use reasonable care to protect the System while the System was in Suez's control, including while the System was shut down prior to the first fire"; " a duty to use reasonable care in responding to the first fire"; and "a duty to use reasonable care in the planning and execution of remediation efforts after the first fire." (Compl. (Doc. 1) ¶¶ 141-44.) Further, Plaintiff alleges Suez breached these duties by "designing and providing an MRS

that was dangerous, inadequately tested, unreliable, and unfit for its intended use," and failing to properly respond to the first fire inside the GAC unit. (See id. ¶¶ 147–51.)

These allegations serve as the basis for Plaintiff's breach of contract and breach of warranty causes; Plaintiff alleges Suez breached the Contract by:

> failing to provide the City with a safe, reliable, and operable System; failing to provide the City with adequate training; failing to provide the City with an MRS free from defects in workmanship, design, and/or materials; failing to properly commission the System; failing to provide an MRS or System that could meet the MACT standards or the contract's performance guarantees on a continuous basis; and failing to complete its work in a timely manner.

(Id. ¶ 133.) Plaintiff further alleges Suez made express and implied warranties to Plaintiff, and breached those warranties by:

> failing to supply and install an MRS in conformance with the contract; failing to provide the City with a safe, reliable, and operable System; failing to provide the City with an MRS free from defects in workmanship, design, and/or materials; failing to properly commission the System; failing to provide a System that could meet the MACT standards or the contract's performance guarantees on a continuous basis; failing to complete its work in a timely manner; failing to provide an MRS that would not catch fire; failing to provide an MRS that was fit for the City's particular purpose or any ordinary purpose; and failing to provide appropriate carbon media.

(Id. ¶ 137–38.) Thus, the economic loss rule bars a separate tort claim based on these allegations.

While Plaintiff does not explicitly allege that Suez was required under the Contract to respond to the first fire, Suez "had full responsibility for the oversight and operation of the System" at the time of the first fire, pursuant to its duty to provide Plaintiff with the GAC unit and install the GAC unit under the Contract. (Id. ¶ 73.) Suez's actions taken in connection with the first fire are therefore not "identifiable and distinct from the primary breach of contract claim." Legacy Data Access, 889 F.3d at 164. Under the economic loss rule, Plaintiff cannot maintain a negligence cause of action based upon Suez's actions taken after entering into the Contract.

### b.    Alleged Negligence Pre-Contract

Plaintiff also argues, however, that Suez breached its duty prior to the Contract. (Pl.'s Resp. (Doc. 24) at 14.) Plaintiff specifically alleges "Suez had a duty to use reasonable care in recommending . . . an MRS that was appropriate for and reasonably safe for its intended use," (Compl. (Doc. 1) ¶ 141), and that Suez breached this duty by "recommending, designing, and supplying the MRS incorporating CPPE's products and design, including the GAC unit, for the Project"; "submitting to Hazen designs and specifications for the Project that resulted in an MRS that was unfit for its intended use"; and "designing and

providing an MRS that was dangerous, inadequately tested, unreliable, and unfit for its intended use," (id. ¶¶ 145-47.)

Plaintiff, however, alleges that Suez breached the Contract by "failing to provide the City with an MRS free from defects in workmanship, <u>design</u>, and/or materials." (<u>Id.</u> ¶ 133 (emphasis added).) Designing the MRS thus serves as part of the basis of Plaintiff's breach of contract cause of action; it therefore cannot serve as the basis for a negligence claim "identifiable and distinct from the primary breach of contract claim." Further, providing an MRS free from defects is also part of Plaintiff's breach of contract cause of action and therefore cannot serve as a basis for Plaintiff's negligence cause of action.

This leaves Suez's allegedly breached duty to recommend the MRS incorporating CPPE Carbon's products and design, including the GAC unit as the remaining basis for Plaintiff's negligence cause of action. (<u>Id.</u> ¶ 145.) This involves Suez's actions dating back to 2012, when it "represented to Hazen that the inclusion of CPPE's products and its unique 'Kombisorbon' mercury removal process in the MRS would best enable the City to comply with the MACT standards for the control of mercury emissions." (<u>Id.</u> ¶ 20.)

The court, however, finds that, because Plaintiff's negligence cause of action has been whittled down to Suez's recommendations pre-contract, and the allegedly negligent recommendations also serve as the basis for Plaintiff's negligent misrepresentation cause of action, (compare id. ¶¶ 145–46, with id. ¶¶ 157–58), Plaintiff's negligence cause of action based on Suez's recommendations is better characterized as a negligent misrepresentation cause of action. The court will thus consider Suez's recommendations as part of Plaintiff's negligent misrepresentation cause of action.

At this point in the analysis, the court finds that the economic loss rule bars Plaintiff's negligence cause of action to the extent it alleges negligence beyond recommending the MRS incorporating CPPE Carbon's products and design and will therefore grant Suez's motion to dismiss under Rule 12(b)(6). The court will next address the alleged negligent misrepresentations.

### 2. **Fourth and Fifth Causes of Action: Negligent Misrepresentation and Fraud**

In support of its fraud and negligent misrepresentation causes of action, Plaintiff alleges Suez made fraudulent and/or negligent misrepresentations regarding Suez's relationship with CPPE Carbon, the cost of complying with the MACT standards, Suez's experience in providing and installing GAC units, other

fires or high-temperature incidents with equipment similar or identical to the equipment Suez was providing, and the nonstandard design of the GAC unit, among others. (See Compl. (Doc. 1) ¶¶ 158, 163–67.) Plaintiff alleges "Suez had a duty to use reasonable care in preparing and providing information to Hazen to be relied upon by the City regarding complying with the MACT standards, Suez's bid proposal, and Suez's work on the Project, both before and after Suez entered into a contract with the City," and that it breached this duty by "failing to use reasonable care in preparing and providing information to be relied upon by the City." (Id. ¶¶ 157-58.) Plaintiff also alleges "Suez knew that it was misrepresenting and/or concealing material facts, and Suez's misrepresentations and concealments were calculated to deceive the City," or that "[a]t a minimum, Suez made its representations recklessly without any knowledge of their truth." (Id. ¶ 167.)

### a. Fraud and Negligent Misrepresentation Background

To state a claim for fraud in North Carolina, a plaintiff must allege a "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injury [sic] party." Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974). Thus,

-23-

"fraud may be based on an 'affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction which the parties had a duty to disclose.'" Hardin v. KCS Int'l, Inc., 199 N.C. App. 687, 696, 682 S.E.2d 726, 733 (2009) (quoting Harton v. Harton, 81 N.C. App. 295, 297, 344 S.E.2d 117, 119 (1986)).

Regarding the relationship between fraud and the economic loss rule, North Carolina courts have held that "while claims for negligence are barred by the economic loss rule where a valid contract exists between the litigants, claims for fraud are not so barred and, indeed, '[t]he law is, in fact, to the contrary: a plaintiff may assert both claims[.]'" Bradley Woodcraft, Inc. v. Bodden, 251 N.C. App. 27, 34, 795 S.E.2d 253, 259 (2016) (quoting Jones v. Harrelson & Smith Contractors, LLC, 194 N.C. App. 203, 215, 670 S.E.2d 242, 250 (2008)). Therefore, in Bradley Woodcraft, the defendant could counterclaim for fraud because the plaintiff not only failed to complete work required under the contract (which was a breach of contract), but also "had no intention of doing so" from the very beginning (which constitutes fraud). Bradley Woodcraft, 251 N.C. App. at 30-35, 795 S.E.2d at 256-59.

The Fourth Circuit, however, interpreted Bradley Woodcraft to be "simply another application of the principle that the

economic loss rule does not bar tort claims based on an
independent legal duty, which is 'identifiable and distinct'
from the contractual duty." Legacy Data Access, 889 F.3d at 166
(quoting Broussard, 155 F.3d at 346)); see also Dillon v. Leazer
Grp., Inc., 374 F. Supp. 3d 547, 558–59 (E.D.N.C. 2019)
(distinguishing Bradley Woodcraft and finding the "fraud claim
[in Bradley Woodcraft] was independent of breach of contract, by
virtue of fraudulent misrepresentation preceding contract
formation and identified lack of present intent to perform terms
thereof"); but see Prassas Capital, LLC v. Blue Sphere Corp.,
No. 3:17-cv-131-RJC-DCK, 2018 WL 1567362, at *5 (W.D.N.C.
Mar. 30, 2018) (following Bradley Woodcraft's holding); Cargill,
Inc. v. WDS, Inc., No. 3:16-cv-00848-FDW-DSC, 2018 WL 1525352,
at *5 (W.D.N.C. Mar. 28, 2018) ("Thus, following the final
authority on state law for the tort claims brought in this
diversity suit, the Court concludes and reaffirms its
determination that Plaintiffs' tort claims are not barred by the
economic loss rule." (internal citation and quotation marks
omitted)).

This court finds the Fourth Circuit's interpretation of
Bradley Woodcraft persuasive and thus will apply it to the
instant case. Plaintiff therefore must plead that Suez had an

"independent legal duty, which is 'identifiable and distinct'"
from those set out in the contract.

With respect to negligent misrepresentation, "[t]he tort of
negligent misrepresentation occurs when a party justifiably
relies to his detriment on information prepared without
reasonable care by one who owed the relying party a duty of
care." Rountree, 252 N.C. App. at 158, 796 S.E.2d at 830
(quoting Raritan River Steel Co. v. Cherry, Bekaert & Holland,
322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988)).

Here, Suez first argues that the economic loss rule bars
Plaintiff's fraud and negligent misrepresentation causes of
action for want of an "identifiable and distinct" legal duty.
(Suez's Br. (Doc. 9) at 17–20.) Suez also argues that
Plaintiff's fraud and negligent misrepresentation causes of
action should be dismissed "because the City has failed to
establish that it reasonably or justifiably relied on the
alleged misrepresentations and concealments." (Id. at 22–23,
26-27.) The court will address these arguments in turn.
Suez does not challenge Plaintiff's fraud and negligent
misrepresentation claims with respect to the other elements; the
court will thus treat these elements as plausibly alleged.

### b. **Plaintiff Has Pled a Separate and Distinct Duty**

The court first must determine whether Plaintiff has plausibly alleged a separate and distinct duty from those under the Contract.

"Under North Carolina law, a party to a contract owes the other contracting party a separate and distinct duty not to provide false information to induce the execution of the contract." Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc., No. 1:09cv00018, 2010 WL 3943754, at *2 (M.D.N.C. Oct. 7, 2010); see also Ada Liss Grp. v. Sara Lee Corp., No. 06CV610, 2010 WL 3910433, at *11 (M.D.N.C. Apr. 27, 2010) (finding that the defendant owed the plaintiff "a duty not to provide deceptive or misleading information" in connection with their distributorship agreement); but see Wireless Commc'ns, Inc. v. Epicor Software Corp., Civil No. 3:10CV556-DSC, 2011 WL 90238, at *5-6 (W.D.N.C. Jan. 11, 2011) (distinguishing Ada Liss and Schumacher on the basis that the plaintiffs in those cases "specifically pled facts that the defendants never intended to perform the contracts or specifically intended to deceive the plaintiffs," whereas the plaintiff in Wireless Communications never "allege[d] that Epicor entered into the Agreement with the intent not to perform"). In other words, a breach of duty giving

rise to a claim of negligent misrepresentation has been defined
as:

> One who, in the course of his business, profession or
> employment, or in any other transaction in which he
> has a pecuniary interest, supplies false information
> for the guidance of others in their business
> transactions, [and thus] is subject to liability for
> pecuniary loss caused to them by their justifiable
> reliance upon the information, if he fails to exercise
> reasonable care or competence in obtaining or
> communicating the information.

Rountree, 252 N.C. App. at 160, 796 S.E.2d at 831 (quoting Simms

v. Prudential Life Ins. Co. of Am., 140 N.C. App. 529, 534, 537

S.E.2d 237, 241 (2000) (alteration in original)). "Such a duty

commonly arises within professional relationships." Id.

Further,

> a duty to disclose arises where: (1) there is a
> fiduciary relationship between the parties to a
> transaction; or (2) no fiduciary relationship exists
> yet "a party has taken affirmative steps to conceal
> material facts from the other"; or (3) no fiduciary
> relationship exists and "one party has knowledge of a
> latent defect in the subject matter of the
> negotiations about which the other party is both
> ignorant and unable to discover through reasonable
> diligence."

Hutton v. Hydra-Tech, Inc., No. 1:14CV888, 2018 WL 1363842, at

*7 (M.D.N.C. Mar. 15, 2018) (quoting Hardin, 199 N.C. App. at

696, 682 S.E.2d at 733). Here, Plaintiff seems to rely on the

second and third circumstances; Plaintiff does not allege a

fiduciary relationship but alleges that Suez concealed material

facts and that Suez had knowledge of inadequacies in the MRS and the GAC unit.

Specifically, Plaintiff alleges "Suez had a duty to use reasonable care in preparing and providing information to Hazen to be relied upon by the City regarding complying with the MACT standards, Suez's bid proposal, and Suez's work on the Project, both before and after Suez entered into a contract with the City," and that it breached this duty by "fail[ed] to use reasonable care in preparing and providing information to be relied upon by the City." (Compl. (Doc. 1) ¶ 157-58.)

Plaintiff further alleges Suez "knew that it was misrepresenting and/or concealing material facts, and Suez's misrepresentations and concealments were calculated to deceive the City. At a minimum, Suez made its representations recklessly without any knowledge of their truth." (Id. ¶ 167.)

For example, Plaintiff alleges Suez misrepresented the history of GAC units being used in sewage-sludge incinerators, the risks associated with GAC units, and the history of fires in similar equipment. (See, e.g., Compl. (Doc. 1) ¶¶ 158, 165.) These representations pertain to information Suez allegedly had during the time period prior to entering into the Contract and for the purpose of inducing Plaintiff to enter into the Contract. The court compares these facts to those in Schumacher,

in which the defendant provided false information about a
current circumstance in order to induce the execution of the
contract. See Schumacher, 2010 WL 3943754, at *2.

The court also notes that some of Plaintiff's allegations
concerning Suez's representations as to its ability to provide
and install a GAC unit, are closer to representations that
concern performance under the Contract. These representations
are more akin to those at issue in Wireless Communications.
There, the defendant made representations almost solely about
its ability to perform under the contract and the court
dismissed the plaintiff's negligent misrepresentation and fraud
claims as barred by the economic loss rule. Wireless Commc'ns,
2011 WL 90238, at *5-6. While this may be the case with Suez's
alleged misrepresentations concerning its ability to perform
under the Contract, the court finds that, based on all of the
allegations, Plaintiff has plausibly alleged "a separate and
distinct duty not to provide false information to induce the
execution of the contract," and the economic loss rule thus does
not bar Plaintiff's fraud and negligent misrepresentation
claims. See Schumacher, 2010 WL 3943754, at *2; Definitive
Staffing Sols., Inc. v. Staffing Advantage, L.L.C., No. 7:18-CV-
187-FL, 2019 WL 3660878, at *6 (E.D.N.C. Aug. 6, 2019) ("While
plaintiff's breach of contract claim looks to whether defendant

performed under the Agreement, plaintiff's fraud and UDTPA
claims focus on whether defendants procured the Agreement under
false pretenses or deceptively performed under the Agreement to
increase their income without plaintiff's knowledge or
consent.").

The court limits this holding to representations made prior
to entering into the Contract; to the extent Suez made
misrepresentations or provided information after the Contract
was entered into, Plaintiff's remedy lies in contract, as
Plaintiff at that point had already been "induced" into entering
into the Contract.

### c. **Plaintiff Has Pled Reasonable Reliance**

However, "the injured party's reliance [on the
misrepresentations] must be reasonable." William L. Thorpe
Revocable Tr. v. Ameritas Inv. Corp., No. 4:11-CV-193-D, 2012 WL
4193096, at *9 (E.D.N.C. Sept. 19, 2012). "Justifiable reliance
is an essential element of both fraud and negligent
misrepresentation." Cobb v. Pa. Life Ins. Co., 215 N.C. App.
268, 277, 715 S.E.2d 541, 549-50 (2011) (quoting Helms v.
Holland, 124 N.C. App. 629, 635, 478 S.E.2d 513, 517 (1996)).
"The 'question of justifiable reliance [for negligent-
misrepresentation claims] is analogous to that of reasonable
reliance in fraud actions.'" McMillan v. Cumberland Cty. Sch.,

No. 5:14-CV-344-D, 2016 WL 5660243, at *10 (E.D.N.C. Sept. 29, 2016) (quoting Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP, 350 N.C. 214, 224, 513 S.E.2d 320, 327 (1999)).

"Whether a party's reliance is justified is generally a question for the jury, except in instances in which 'the facts are so clear as to permit only one conclusion.'" Dallaire v. Bank of Am., N.A., 367 N.C. 363, 369, 760 S.E.2d 263, 267 (2014) (quoting Marcus Bros. Textiles, 350 N.C. at 225, 513 S.E.2d at 327); see also Rountree, 252 N.C. App. at 162, 796 S.E.2d at 832 ("While normally a question for the jury, the only conclusion that can be drawn from the evidence is that plaintiff's reliance was not justifiable."). The court will therefore examine whether the "the facts are so clear as to permit only one conclusion."

"[T]o establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he 'was denied the opportunity to investigate or that he could not have learned [. . . the true facts] by exercise of reasonable diligence.'" Arnesen v. Rivers Edge Golf Club & Plantation, Inc., 368 N.C. 440, 454, 781 S.E.2d 1, 11 (2015) (quoting Dallaire, 367 N.C. at 369, 760 S.E.2d at 267); see also Solum v. Certainteed Corp., 147 F. Supp. 3d 404, 411 (E.D.N.C. 2015) ("At the pleading stage, when a plaintiff could have discovered the truth about the misrepresentation upon

-32-

inquiry, a plaintiff must allege that it was denied the opportunity to investigate or could not have learned the true facts by exercise of reasonable diligence." (internal quotation marks omitted)); cf. MacFadden v. Louf, 182 N.C. App. 745, 748, 643 S.E.2d 432, 434 (2007) ("In an arm's-length transaction, when a purchaser of property has the opportunity to exercise reasonable diligence and fails to do so, the element of reasonable reliance is lacking and the purchaser has no action for fraud." (quoting RD & J Props. v. Lauralea-Dilton Enters., LLC, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004)).

Suez argues that Plaintiff has "failed to establish that it reasonably or justifiably relied on the alleged misrepresentations and concealments." (Suez's Br. (Doc. 9) at 22.) The court finds, however, that the facts are not "so clear as to permit only one conclusion," that Plaintiff did not justifiably rely on Suez's misrepresentations.

The court instead finds that Plaintiff plausibly alleges it justifiably relied upon Suez's statements, and the court will therefore deny Suez's motion to dismiss Plaintiff's fraud and negligent misrepresentation causes of action.

Plaintiff alleges that "[b]ased upon Suez's misrepresentations and concealments, the City elected to install the MRS incorporating CPPE's products and design, including the

GAC unit, at the Treatment Plant," and that the "City actually, justifiably, and reasonably relied on Suez's representations, to the City's detriment." (Compl. (Doc. 1) ¶¶ 160, 168.) Plaintiff also alleges that Hazen, as its agent, "relied upon Suez's representations about the safety and performance of the MRS incorporating CPPE's products and design, including the GAC unit. Hazen would not have recommended the MRS incorporating CPPE's products and design, including the GAC unit, to the City had it not been for Suez's representations." (Id. ¶ 33.)

Specifically, Plaintiff submits at least four "misrepresentations and concealments" it relied upon, including: (1) "Suez's experience with carbon adsorption in the treatment of mercury emissions from [sewage-sludge incinerators]," (2) "[t]he inadequate testing in the context of [sewage-sludge incinerators] of the products and design represented to be necessary to meet the MACT standards for mercury emissions," (3) "[t]he existence of fires or high-temperature events at facilities with equipment similar to the equipment that Suez was providing," and (4) "Suez's ability to provide a safe, functional, and reliable System." (Pl.'s Resp. (Doc. 24) at 18.)

Plaintiff does not allege that it "made a reasonable inquiry into the misrepresentation," nor that it "was denied the

opportunity to investigate," nor that it "could not have learned the true facts by exercise of reasonable diligence."

The alleged misrepresentations involve facts that are not so clear as to permit only the conclusion that Plaintiff's reliance was unjustified. For instance, Plaintiff alleges that "Suez did not inform Hazen of the non-standard design of the GAC unit manufactured by CPPE and did not inform Hazen that this non-standard design increased fire risks in the GAC unit." (Compl. (Doc. 1) ¶ 32.) Further, Suez represented that it had extensive experience with CPPE Carbon's GAC units. (Id. ¶ 22.) Plaintiff also alleges that Suez did not tell Hazen or the City that GAC units "had rarely, if ever, been used to treat mercury emissions." (Compl. (Doc. 1) ¶ 25.) Finally, Plaintiff alleges that by "2012, th[e] history of fires and high-temperature incidents in GAC units was well known to manufacturers and distributors in the industry, including CPPE and Suez." (Id. ¶ 28.)

The court finds that whether it was reasonable for Plaintiff to rely upon these representations depends upon facts not before the court. See Songwooyarn Trading Co. v. Sox Eleven, Inc., 213 N.C. App. 49, 55, 714 S.E.2d 162, 167 (2011) ("A plaintiff is not barred from recovery because he had a lesser opportunity to investigate representations made by someone with

superior knowledge.") Therefore, "[a]t this preliminary stage, it is not clear from the facts alleged that [Plaintiff] could have discovered the truth about the[se] alleged misrepresentation[s] upon reasonable inquiry." Vinson v. Int'l Bus. Machs. Corp., No. 1:17-cv-00798, 2018 WL 4608250, at *10 (M.D.N.C. Sept. 25, 2018); Johnson v. Owens, 263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965) ("[t]he law does not require a prudent man to deal with everyone as a rascal." (quoting Gray v. Jenkins, 151 N.C. 80, 80, 65 S.E. 644, 645 (1909))). For example, regarding the history of fires known to manufacturers and distributors, the court finds that it is not clear that this information was reasonably available to those beyond manufacturers and distributors such that it was unreasonable for Plaintiff to rely upon this misrepresentation.

The court will therefore deny Suez's motion to dismiss Plaintiff's fraud and negligent misrepresentation causes of action.

### 3.   Unfair and Deceptive Trade Practices

Plaintiff alleges Suez committed unfair and deceptive acts, including misrepresenting its experience with the MACT standards and mercury removal in sewage-sludge incinerators; the safety of the CPPE Carbon MRS and the safety of those products in general;

and its ability to provide a safe and reliable MRS. (See Compl. (Doc. 1) ¶ 174.)

The court first observes that there is debate about whether the economic loss rule may bar a UDTPA claim in North Carolina. See Ramsey v. Bimbo Foods Bakeries Distritubion, LLC, No. 5:15-CV-6-BR, 2015 WL 1611339, at *7 (E.D.N.C. Apr. 10, 2015). The district court in Ramsey noted that "[t]he North Carolina courts have not decided whether the economic loss rule applies to UDTPA claims." Id. That court "decline[d] to create North Carolina common law by extending the economic loss rule to bar plaintiff's UDTPA claim." Id. This court agrees, finding only one unpublished North Carolina Court of Appeals case, Buffa v. Cygnature Constr. & Dev., Inc., 251 N.C. App. 526, 796 S.E.2d 64, at *6 (2016) (table), which appears to affirm the lower court applying the economic loss rule to a UDTPA claim. This court will therefore also decline to create North Carolina common law and will thus address Plaintiff's UDTPA claim on the merits. See Ramsey, 2015 WL 1611339, at *7.

Pursuant to N.C. Gen. Stat. § 75-1.1, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). "The determination of whether an act or practice is an unfair or deceptive practice

-37-

that violates N.C.G.S. § 75-1.1 is a question of law for the court." Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). "In order to establish a violation of N.C.G.S. § 75-1.1, a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Id.

"Egregious or aggravating circumstances must be alleged before the provisions of the [UDTPA] may take effect. Aggravating circumstances include conduct of the breaching party that is deceptive. Finally, in determining whether a particular act or practice is deceptive, its effect on the average consumer is considered." Ellis, 699 F.3d at 787 (alteration in original) (quoting Becker v. Graber Builders, Inc., 149 N.C. App. 787, 794, 561 S.E.2d 905, 910-11 (2002) (internal citations omitted)).

"North Carolina courts have repeatedly held that a mere breach of contract, even if intentional," does not rise to the level of being an unfair or deceptive trade practice. Broussard, 155 F.3d at 347 (internal quotation marks omitted). "North Carolina law requires a showing of 'substantial aggravating circumstances' to support a claim under the UTPA," when there has been a breach of contract. Id. Fraud constitutes such an aggravating circumstance. See Nexus Techs., Inc. v. Unlimited

-38-

Power Ltd., CIVIL CASE No. 1:19-cv-00009-MR, 2019 WL 4941178, at *6-7 (W.D.N.C. Oct. 7, 2019) (finding the plaintiff plausibly alleged a UDTPA claim based on the defendant "enter[ing] into the manufacturing agreement despite knowing that they could not deliver a manufacturing design"); Global Hookah Distribs., Inc. v. Avior, Inc., 401 F. Supp. 3d 653, 662 (W.D.N.C. 2019) (recognizing several UDTPA claims upheld on the basis of fraud); Pan-Am. Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 700 (M.D.N.C. 2011) ("Aggravating factors include an intentional misrepresentation for the purpose of deceiving another and which has a natural tendency to injure the other.").

Because the court has already found that Plaintiff plausibly alleges fraud on the part of Suez, and Suez has not contested that the actions were "in or affecting commerce," Plaintiff has plausibly alleged a UDTPA claim. The court will thus deny Defendant's motion to dismiss Plaintiff's Sixth Cause of Action.

**IV.   CONCLUSION**

For the reasons set forth herein,

**IT IS THEREFORE ORDERED** that the Motion to Dismiss, (Doc. 8), filed by Defendant Suez Treatment Solutions Inc., is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** with

respect to Plaintiff's Third Cause of Action to the extent it alleges actions taken after the parties entered into the Contract. The motion is **DENIED** with respect to Plaintiff's Fourth, Fifth, and Sixth Causes of Action. Because Defendant Suez does not move to dismiss Plaintiff's First and Second Causes of Action, these claims survive as well.

**IT IS FURTHER ORDERED** that this case is **STAYED** pending the court's ruling on the Motion to Dismiss, (Doc. 45), filed by Defendant CPPE Carbon Process & Plant Engineering S.A.

This the 19th day of March, 2020.

_____
United States District Judge